1   MANATT, PHELPS & PHILLIPS, LLP
2   Matthew P. Kanny (CA 167118)
    mkanny@manatt.com
    Yi-Chin Ho (CA 204834)
3   yho@manatt.com
    Diana Iketani Iorlano (CA 193359)
4   diorlano@manatt.com
    Joanna Rosen (CA 244943)
5   jrosen@manatt.com
    11355 W. Olympic Boulevard
6   Los Angeles, California 90064
    (310) 312-4000 Telephone
7   (310) 312-4224 Facsimile

8   *Attorneys for Defendants*
    E-Lite Automotive, Inc. & Eagle Eyes Traffic Industrial
9   Co., Ltd.

10              UNITED STATES DISTRICT COURT

11            SOUTHERN DISTRICT OF CALIFORNIA

12

13                                    '13 CV 0445 JM   RBB

| | |
|---|---|
| 14 | PENDING BEFORE THE |
| | CENTRAL DISTRICT OF |
| 15 IN RE AFTERMARKET | CALIFORNIA |
| AUTOMOTIVE LIGHTING | |
| 16 PRODUCTS ANTITRUST | Case No.  CV 09-ML-2007 GW |
| LITIGATION | (PJWx) (C.D. Cal.) |
| 17 | |
| | S.D. Cal Case No: _____ |
| 18 | |
| | **EAGLE EYES AND E-LITE'S** |
| 19 | **MEMORANDUM OF POINTS** |
| | **AND AUTHORITIES IN** |
| 20 | **SUPPORT OF THEIR MOTION** |
| | **TO COMPEL MITCHELL TO** |
| 21 | **PRODUCE DATA** |
| | **RESPONSIVE TO A RULE 45** |
| 22 | **SUBPOENA *DUCES TECUM*** |
| 23 | |
| | Judge:  TBD |
| 24 | Hearing Date:  TBD |
| | Discovery Cut-Off:  March 27, |
| 25 | 2013 |
| | Pre-Trial Conference: September 5, |
| 26 | 2013 |
| | Trial Date: September 17, 2013 |
| 27 | |

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

II.      FACTUAL BACKGROUND ................................................................... 3

      A.     The Central District Action Alleging Price Fixing In The Aftermarket Auto light Industry .............................................. 3

      B.     Mitchell International, Inc ......................................................... 3

      C.     The Subpoena And Mitchell's Failure To Object Or Respond ........... 4

      D.     The Initial Discussions Regarding The Subpoena ..................... 5

      E.     Mitchell Avoids Production Of Its Own ESI And Has Shifted The Burden To Eagle Eyes To Examine And Extract Pricing Data ....................................................................................... 6

      F.     Mitchell's Continued Non-Compliance And Non-Responsiveness ......................................................................... 8

III.     MITCHELL WAIVED ANY AND ALL OBJECTIONS TO THE SUBPOENA .......................................................................................... 11

IV.    THE COURT SHOULD COMPEL MITCHELL TO PRODUCE RESPONSIVE DATA AND INFORMATION AS MITCHELL HAS NOT COMPLIED IN GOOD FAITH AND THE TIME FOR PRODUCTION HAS LONG SINCE PASSED ...................................... 13

      1.     The Requested Data Is Relevant ............................................. 14

      2.     The Burden On Mitchell Is Minimal And Its Delay Tactics Must Come To An End ............................................. 15

V.      CONCLUSION ..................................................................................... 17

Manatt, Phelps & Phillips, LLP
Attorneys At Law
New York

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Berwick v. Hartford Fire Ins., Co.*,
   12-00055-PHX-FJM, 2012 U.S. Dist. LEXIS 95622
   (D. Ariz., July 11, 2012)................................................................. 13, 14

*Goodman v. United States*,
   369 F.2d 166 (9th Cir. 1966) ............................................................. 13

*In re Aftermarket Automotive Lighting Products Antitrust Litigation*, 09-ml-
   2007 GW (PJWx) ................................................................................. 1

*In re DG Acquisition Corp.*,
   151 F.3d 75 (2d Cir. 1998) ................................................................. 12

*Kandant Johnson, Inc. v. D'Amico*,
   12-mc-00126, 2012 U.S. Dist. LEXIS 63162
   (D. Or. May 4, 2012) ......................................................................... 12

*LG Display Co. v. Chi Mei Optroelectronics Corp.*,
   08cv2408-L (POR), 2009 U.S. Dist. LEXIS 6362
   (S.D. Cal. Jan. 28, 2009) ............................................................. 13, 16

*Marti v. Baires*,
   08-cv-00653-AWI-SKO PC, 2012 U.S. Dist.
   LEXIS 77962 (E.D. Cal. June 5, 2012).......................................... 15, 16

*Moon v. SCP Pool Corp.*,
   232 F.R.D. 633 (C.D. Cal. 2006) ....................................................... 12

*Painters Joint Comm. v. Emple. Painters Trust
   Health & Welfare Fund*,
   10-cv-01385-JCM-PAL, 2011 U.S. Dist. LEXIS 113278
   (D. Nev. Sept. 28, 2011).............................................................. 13, 15

*Patrick Collins, Inc. v. Does*,
   2012 U.S. Dist. LEXIS 40207 (S.D. Cal. Mar. 23, 2012)...................... 1

*Realtime Data, LLC v. MetroPCS Tex., LLC*,
   12cv1048-BTM (MDD), 2012 U.S. Dist. LEXIS 73257
   (S.D. Cal. May 25, 2012) .................................................................. 14

*United States v. Ryan*,
   402 U.S. 530 (1971) .......................................................................... 11

ii

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
NEW YORK

*Widevoice Communications v. Qwest Communications, Co.*,
   12-cv-00467-GMN –VCF, 2012 U.S. Dist. LEXIS 58248,
   *7-8 (D. Nev. Apr. 26, 2012) ............................................................................. 12

*Wilbur v. City of Mount Vernon*,
   C11-1100RSL, 2012 U.S. Dist. LEXIS 91473
   (W.D. Wash. June 27, 2012) .............................................................................. 15

# RULES

Fed. R. Civ. P. 26(b)(1) ............................................................................ 13

Fed. R. Civ. P. 37 ..................................................................................... 16

Fed. R. Civ. P. 37(a) ................................................................................... 1

Fed. R. Civ. P. 45 .............................................................................. passim

Fed. R. Civ. P. 45(a)(1)(C) .................................................................. 11, 13

Fed. R. Civ. P. 45(c)(2)(B) .............................................................. passim

Fed. R. Civ. P. 45(c)(3)(A) ..................................................................... 11

Local Rule 26.1 .......................................................................................... 1

EAGLE EYES & E-LITE'S MEMORANDUM OF POINTS AND AUTHORITIES ISO OF THEIR MOTION TO COMPEL
MITCHELL  – CASE NO. _____

Pursuant to Rules 37(a) and 45 of the Federal Rules of Civil Procedure and Local Rule 26.1, Eagle Eyes Traffic Industrial Co., Ltd. and E-Lite Automotive Inc. ("Eagle Eyes"), Defendants in *In re Aftermarket Automotive Lighting Products Antitrust Litigation*, 09-ml-2007 GW (PJWx), pending in the Central District of California ("Central District Action"), hereby move Mitchell International, Inc. ("Mitchell"),[1] to produce information responsive to the Rule 45 Subpoena *Duces Tecum* served on it on September 4, 2012.

## I.    INTRODUCTION

Eagle Eyes served Mitchell, a company that provides information to the automotive repair and casualty claims industry, with a Subpoena on September 4, 2012, seeking pricing information of auto lights in connection with an antitrust action in the Central District of California alleging Eagle Eyes and its co-Defendants fixed the prices of aftermarket taillights in the United States.  The plaintiffs allege in that action that Defendants' alleged price-fixing caused them to pay more for auto lights than they should have.  As such, to the extent that market data shows that Defendants' customer did not pay more than they would have had they purchased products from others, the electronically stored pricing data[2] which is only available from Mitchell, is relevant to issues in dispute.  Moreover, Mitchell, as the owner of the pricing data and the developer of the proprietary software that houses such data, is the party best equipped to produce this data.

*More than five months later*, and despite not having objected to the Subpoena

---

[1] This Court has jurisdiction over this dispute as the Subpoena was issued from the Southern District of California and Mitchell resides within, as was served with the Subpoena in, this District.  *See Patrick Collins, Inc. v. Does*, 2012 U.S. Dist. LEXIS 40207, *3 (S.D. Cal. Mar. 23, 2012).

[2] The Subpoena specifically called for the production of Electronically Stored Information such as databases, electronic data compilations and spreadsheets as pricing information in this format can be easily manipulated or analyzed by computer programs.  Pricing information in, for example, a .pdf file cannot be manipulated; someone must actively re-type that data into a spreadsheet or database before it can be used (as the OCRing process is not reliable or accurate for numbers), and where a spreadsheet can exceed several thousand pages, that is a daunting proposition.  Declaration of Joanna Rosen ("Rosen Decl.") at ¶ 28.

or moved this Court to quash/modify the subpoena, Mitchell still has not produced *any* electronically stored pricing data.  While Mitchell has generally said that it will be expensive or difficult to retrieve the pricing data, it has never once said that it does not have the requested data and it has never provided Eagle Eyes with an estimate of how much it would cost to extract the data.  Mitchell has the pricing data, but does not want to have to do any work to produce it.

Further, Mitchell has responded with silence to Eagle Eyes' genuine questions about Mitchell's data systems and sincere requests for updates on the status of Mitchell's non-existent-production.  With Mitchell not having produced any electronic pricing data by mid-November, and clearly disinclined to do so, Eagle Eyes agreed to have Mitchell send it an exemplar pricing data CD so that it could examine its responsiveness; Eagle Eyes did not need to take on this burden but chose to do so to demonstrate its good faith and to alleviate any outstanding burden on Mitchell.  But, when Eagle Eyes finally received this CD a month later, the pricing data Mitchell promised did not appear to be on the CD and, even if it were, Mitchell failed to provide Eagle Eyes with the necessary password to access it.  Since then, Eagle Eyes' requests for the password have been ignored.

It is clear now that Mitchell never intended to comply with the Subpoena.  For example, there is reason no why Mitchell would send Eagle Eyes a CD requiring a password and then never provide it with those credentials unless it wanted to frustrate Eagle Eyes' discovery efforts.  The roadblocks, silence and gamesmanship must come to an end.  "Not wanting" to have to produce responsive data is not an excuse for noncompliance with Rule 45.  This Court should grant this Motion to Compel and Order Mitchell to either:  (1) export and produce in a non-proprietary, usable format all of the pricing data for auto lights in the U.S. **OR** (2) create and run all necessary queries to retrieve responsive data from its Estimate's Database and produce that to Eagle Eyes for the period of January 1, 2001 and December 31, 2010 (the "Pricing Data").

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
New York

2

EAGLE EYES & E-LITE'S MEMORANDUM OF POINTS AND AUTHORITIES ISO OF THEIR MOTION TO COMPEL
MITCHELL  – CASE NO. _____

## II.   FACTUAL BACKGROUND

### A.   The Central District Action Alleging Price Fixing In The Aftermarket Auto light Industry

A class of direct purchaser plaintiffs allege in the Central District Action that Eagle Eyes and its co-Defendants (manufacturers of aftermarket autolights and their distributors) conspired with one another between July 2001 and February 2009 (the "Class Period") to fix the prices of aftermarket autolights in the United States in violation of the Sherman Act.  *See* First Amended Consolidated Class Action Complaint in the Central District Action, Docket No. 158.  Discovery in the Central District Action will close on March 27, 2013. Declaration of Joanna Rosen ("Rosen Decl.") at ¶ 2.  Defendants' expert report is due on April 30, 2013.  *Id.*

### B.   Mitchell International, Inc.

Mitchell claims to process "over 50 million transactions annually for over 300 insurance companies/claims payers and over 30,000 auto collision repair shops."  *Id.* at Ex. A.1.  Mitchell has developed and uses "leading-edge technology, extensive information resources and personal service with broad claims management expertise," *id.*, to track, *inter alia*, the price of automotive parts, including aftermarket autolights, so that insurance agents, auto body shops, and adjusters can "price out" a repair.  *See also id.* ("Mitchell . . . developed the industry's first accurate, functioning car parts replacement information source for collision-damaged vehicles.").

One of Mitchell's "products" is the Collision Estimator's Guide, better known as the "Mitchell Book."  The Mitchell Book lists all the prices of original equipment manufactured party by parts by make, model and year.  *See id.* at  ¶¶ 14, 23, Ex. H, J.

Mitchell also maintains a database called "MAPPs," which contains real-time pricing information.  *See id.* at ¶ 11.  As MAPPs is "dynamic," the database does not store historical pricing; only by backing up Mitchell's system-wide tapes and

1   restoring the MAPPs database could you access MAPPs' historical pricing.  *Id.*

2   Historical data from the MAPPs database is not the subject of this Motion as

3   Mitchell has not kept back-up tapes for the Class Period.  *See id.*

4   　　　Mitchell has, however, developed proprietary software, called "Ultramate,"

5   which also provides pricing information.  Ultramate is an online program but can

6   also be downloaded by CD.  Mitchell periodically sends it customers without online

7   access "Ultramate CDs," which contains the most current pricing information/

8   update.  *Id.* at ¶ 21.  These CD are encrypted such that any data on a CD older than

9   90 days cannot be accessed (as such pricing data is outdated).  *See id.*

10   　　　Another Mitchell database, called the "Estimates Database," stores the

11   invoices of/claims for repairs.  *Id.* at ¶ 12.  Thus, whereas the Mitchell Book and

12   Ultramate provides manufacturer's sales price, the Estimates Database would tell

13   one how much was actually paid for a repair.  *See id.*  Mitchell actively stores data

14   from the Estimates Database dating back to 2002.  *See id.* at Ex. L.

15   **C.　　The Subpoena And Mitchell's Failure To Object Or Respond**

16   　　　On September 4, 2013, Eagle Eyes served Mitchell with a Subpoena *Duces*

17   *Tecum* compelling production by September 21, 2012, of just three categories of

18   documents and information, including:

19   　　　　All databases, including spreadsheets, electronic data compilations and
　　　　other Documents sufficient to show the pricing of all [Original

20   　　　　Equipment Manufactured and Salvaged][3] Auto Light parts, including but not

21   [3] The Subpoena defines Original Equipment Manufactured Auto Light parts as:
    "any original equipment manufacturer produced light products, including but not

22   limited to, headlamps, driving lamps, fog lamps, cornering lamps, spot lights, off-
    road lamps, signal lights, identification lights, front position lamps, parking lamps,

23   daytime running lamps, sidemarker lights, turn signals, rear position laps, brake
    signals, hazard flashers, rear license plate lamps, reflectors, internal vehicle

24   lighting, ornamental lights, and emergency vehicle lights." Rosen Decl. at Ex. B.

25   The Subpoena defines "Salvage Auto Lights" as any "any salvage, used, repaired
    and/or reconditioned original equipment manufacturer produced automotive

26   lighting product, including, but not limited to, including but not limited to,
    headlamps, driving lamps, fog lamps, cornering lamps, spot lights, off-road lamps,

27   signal lights, identification lights, front position lamps, parking lamps, daytime
    running lamps, sidemarker lights, turn signals, rear position laps, brake signals,

28   hazard flashers, rear license plate lamps, reflectors, internal vehicle lighting,

limited to [Original Equipment Manufactured and Salvaged] Auto Light parts organized by Partslink number,[4] during the Relevant Time Period.[5] *Id.* at Ex. B, ¶ 6.  The Subpoena sought only the underlying pricing data.  *Id.* at ¶ 7.[6]

Mitchell did not serve objections to the Subpoena by September 18, 2012, as required by Rule 45 of the Federal Rules of Civil Procedure.  *See id.* at ¶ 8; Fed. R. Civ. P. 45(c)(2)(B).  As such, on September 20, 2012, Joanna Rosen, counsel for Eagle Eyes, contacted Mitchell.  Rosen Decl. at ¶ 8.  Jason Grey, in house counsel for Mitchell, advised Ms. Rosen that Mitchell would *not* be producing documents by the September 21, 2012 deadline, and directed her to speak further with Mitchell's outside counsel, Scott Schutte.  *Id.*[7]

## D.   The Initial Discussions Regarding The Subpoena

On October 3, 2012, conversation, Mr. Schutte generally explained the MAPPs database and Estimates Database to Ms. Rosen.  *See Id.* at Exs. B, C. Because the parties did not learn until later that Mitchell's back-up tapes only "go-back" one year, Mr. Schutte advised Mr. Rosen that the only way to retrieve MAPPs historical pricing data would be to restore the system-wide back-up tapes. *See id.* at ¶ 11.  In regard to the Estimates Database, Mr. Schutte stated that he

---

ornamental lights, and emergency vehicle lights."  *See id.*

[4] "Partslink" number refers to an industry convention for the numbering of an identification of auto parts.  Rosen Decl. at ¶ 13.

[5] The Relevant Time Period was defined in the subpoena as:  January 1, 2000 through September 4, 2012.  Rosen Decl. at Ex. B.  For this, and to alleviate any burden on Mitchell, if any, Eagle Eyes seeks responsive data for the period of January 1, 2001 and December 31, 2010.

[6] The third request sought documents pertaining to Mitchell's document retention and document destruction policies.  Mitchell has produced one document that is responsive to this request.  *See* Rosen Decl. also at Ex. L.  Mitchell also produced the pre-2006 industry reports and analyses it published, most of which "were (and some still are) publicly available" online.  *See id.* at Ex. I.

[7] Eagle Eyes also served Mitchell with a Subpoena To Testify At A Deposition In A Civil Action on September 28, 2012.  Rosen Decl. at Ex. B.  Mr. Grey informed Ms. Rosen that Mitchell would also *not* be appearing for a deposition on September 28, 2012.  *Id.* at ¶ 8.  As Mitchell has not yet produced pricing data responsive to the Subpoena, Eagle Eyes has not been able to take its deposition.  Eagle Eyes preserves all its rights to serve Mitchell with a deposition subpoena.

believed "queries" could be written to search specific parts/data, but that the writing and running of such queries would be expensive and laborious.  *See id.* at  ¶ 12.

Ms. Rosen had several follow-up questions, including "What would be the general cost or rate per query [of the Estimate's Database]? . . . would a separate query have to be run for each [part number]?", how far back in time back-up tapes are kept, and whether hard copies/electronic copies of the "Mitchell Book" were available and could be produced.  *See id.* Ex. D, ¶¶ 13, 14.  Mr. Schutte stated he would consult with his client and follow up with Ms. Rosen.  *See id.* at ¶ 13, Ex. D.

### E.  Mitchell Avoids Production Of Its Own ESI And Has Shifted The Burden To Eagle Eyes To Examine And Extract Pricing Data

Mitchell never responded to Eagle Eyes' questions regarding date-range of and costs to access the data on MAPPS and Estimates Database, instead diverting the parties to a entirely different source of data which they still have yet to produce.

After several days passed without any response from Mitchell, Ms. Rosen sent Mr. Schutte an email on October 12, 2012, asking whether he "had heard back from [his] client."  *Id.* at Ex. E, ¶ 16.  Receiving no response, Ms. Rosen emailed Mr. Schutte four days later on October 16, 2012, to "check in with [him] on the Mitchell [S]ubpoena."  *Id.* at Ex. E, ¶ 17.  Six more days elapsed without a response.  *See id.* at ¶ 18.  On October 22, 2012, Ms. Rosen called Mr. Schutte to ask for an update.  *See id.* at ¶ 18, Ex. F.  Three more days passed with no word.  *Id.* at ¶ 19.  Finally, Ms. Rosen sent Mr. Schutte a letter cataloguing her attempts to reach him and asking him to respond to her no later than October 26, 2012; he did not respond by October 26, 2012, as requested.  *See id.* at ¶¶ 19, 20 Ex. F.

Finally, on November 1, 2012, Mr. Schutte contacted Ms. Rosen.  *Id.* at Ex. G.  The focus of this conversation shifted from the MAPPs and Estimate's databases to the "Ultramate" software.  *See id.* at ¶ 21.[8]  Mr. Schutte first explained

---

[8] On November 5, 2012, Mr. Schutte confirmed via email that Mitchell has the Mitchell Books going back to 2001.  *See* Rosen Decl. at ¶ 23, Ex. H.  Later that day, Ms. Rosen replied that "[W]e would definitely like the [Mitchell Books] back to 2001."  *Id.* at ¶ 22, Ex. H.  The next day, Mr. Schutte mentioned for the first time

Manatt, Phelps & Phillips, LLP
Attorneys At Law
New York

how Mitchell's library of Ultramate CDs containing pricing information spanning the Class Period might be an alternative to restoring the MAPPs database or writing queries for the Estimate's Database. *See id.* Although the Ultramate CD's encryption would prevent a user from being able to load and access CDs older than 90 days, he suggested that a "work around" of the encryption could perhaps be devised. *See id.* ¶ 21.

During a subsequent call with Mitchell's IT personnel on November 12, 2012, to discuss a "work-around" the encryption, Mitchell explained that it has a debugger to defeat the CD's encryption. *Id.* at ¶¶ 22, 33, 35. Mitchell's debugger is product specific as opposed to application specific; it could thus decrypt pricing data for specific products for the relevant time period. *See id.* As Mitchell IT personnel said that it would be difficult, although possible, to decrypt this data, the parties discussed whether Mitchell could send Eagle Eyes an "exemplar" CD to give IT personnel at Eagle Eyes' Counsel's law firm, Manatt, Phelps & Phillips ("Manatt") an opportunity to develop a "work around" the encryption. *Id.* at ¶ 36.

that Mitchell published the Mitchell Books quarterly and that each edition of the older versions "totals about 4,000 pages," and "*[t]o make things more difficult*, the [Mitchell Books] are printed on really thin paper, which make it difficult to copy/scan." *Id.* (emphasis added)  Rather than wait to hear back from Ms. Rosen as to how Eagle Eyes wished to proceed in light of this newfound information about how "difficult" it would be to copy these Books, Mr. Schutte emailed Ms. Rosen on November 8, 2012, stating that "there are about 50 boxes of [Mitchell Books], estimated to be about 1,500-2,000 pounds.  How do you want to handle." *Id.* at Ex. J.  That same day, Ms. Rosen sent Mr. Schutte two emails asking questions about the format and organization of the Mitchell Book. *Id.*  On November 9, 2012, Ms. Rosen emailed Mr. Schutte to advise him that "I should know on Monday what we want to do with [the Mitchell Books; whether we will send a vendor in to copy them or not]." *Id.* at Ex. J.  On Tuesday, November 13, 2012, Ms. Rosen followed up with Mr. Schutte and advised him that the cost of xeroxing 2,000 pounds of data that would likely not copy well, and the inability of the Eagle Eyes' experts to manipulate data that is on .pdf files as opposed to ESI, *see infra*, rendered copying of the Mitchell Books not feasible. *See id.* at Ex. L, ¶ 38(a).

Any argument that Mitchell spent thousands of dollars to compile these books, *see id.* at Ex. Q, is a red herring.  The period between when Mr. Schutte first told Ms. Rosen that these books may be "difficult" to copy and when she advised him that Eagle Eyes was not sure whether it would proceed with copying them was approximately 48 hours. *See id.* at Exs. H, J, L.  To suggest that Mitchell incurred significant time, delay or expense in collecting its own bound books and storing them for a handful of days is a non-starter.

1  Eagle Eyes also asked Mitchell to provide it with "a copy of the underlying table(s)
2  that contain the pricing information" that is on the Ultramate CD in a usable format
3  (i.e., text file, Microsoft SQL, Microsoft Access).  Declaration of James Rosenthal
4  ("Rosenthal Decl.") at ¶ 10; Rosen Decl. at ¶ 37.  The Mitchell personnel indicated
5  that they would do so.  *See id.* at ¶ 37; Rosenthal Decl. at ¶ 10.
6        On November 13, 2012, Ms. Rosen sent Mr. Schutte an email asking for a
7  sample Ultramate CD, and stating that  in "choosing to pursue the Ultramate
8  option" Eagle Eyes specifically reserved any and all rights to seek production of
9  data from the Estimate's database at a later time "should we be unable to access the
10 data from and through the Ultramate CD.  At this juncture . . . we think that it is the
11 best use of resources and imposes the least burden on your client to pursue that
12 Ultramate option as that may prove to be the easiest and most cost effective way to
13 obtain responsive information."  *Id.* at Ex. L, ¶¶ 38(b), 38(c).  Thus, Eagle Eyes
14 assumed the burden of examining the Ultramate CD and trying to access and
15 download Mitchell's own ESI in order to minimize any burden and expense on
16 Mitchell.  *See id.* at Ex. L, ¶ 38.

17        **F.   Mitchell's Continued Non-Compliance And Non-Responsiveness**
18        Two weeks passed with no word from Mitchell.  *See id.* at Ex. L, ¶ 40.  On
19 November 28, 2012, Ms. Rosen emailed Mr. Schutte to check in on the status of the
20 Ultramate CD.  *See id.*  Nearly a week passed with no response.  *See id.* at Ex. L, ¶
21 41.  On December 3, 2012, Ms. Rosen called Mr. Schutte and left him a voicemail,
22 inquiring about the Ultramate CD.  *See id.*  Two days later, still having not received
23 any response to either her voicemail message or emails, Ms. Rosen again emailed
24 Mr. Schutte, stating "I have not received a response [from you] regarding the
25 Ultramate CD.  Please contact me to discuss your client's position on this and its
26 remaining obligations under the subpoena."  *Id.* at Ex. L, ¶ 42.
27        Finally, on December 6, 2012, Mr. Schutte responded, indicating that
28 Mitchell would send Eagle Eyes the exemplar CD.  *See id.* at Ex. L.  Eagle Eyes

finally received the sample Utlramate CD on December 14, 2012.  *See id.* at ¶ 45.

Manatt's IT personnel spent a significant amount of time attempting to load, use and analyze the exemplar CD but were quickly frustrated in their attempts as the CD provided appeared to be "just an install disk," and did not have the pricing tables that were promised.  *See* Rosenthal Decl. at ¶¶ 12, 13, 17; Rosen Decl. at Ex. L, ¶ 47.  "Although [Manatt was] able to install the program, [it] could not proceed any further or search for parts to see pricing information without an Organization ID, User ID and Password."  *Id.*  at Ex. L, ¶ 47.

Because Manatt "could not use the CD or access the pricing" information purportedly on this CD, including the underlying pricing tables Mitchell's staff had said they would send to Eagle Eyes, Ms. Rosen contacted Mr. Schutte on December 20, 2012, to advise him that the CD was password protected and asking for either an "Organization ID, User ID and Password to access [the pricing] data," or "the tables, databases or spreadsheets of the parts pricing for a sample month" (in case Mitchell did not want to issue a password for its proprietary software).  *Id.*  Ms. Rosen also included "screen shots of the dialogue boxes [Manatt IT personnel were] encountering when using the CD that [were] prevent[ing] them from going further."  *Id.*

Two weeks passed with no response.  *Id.* at ¶ 48.  On January 3, 2013, Ms. Rosen contacted Mr. Schutte for an update.  *Id.* at Ex. L.  Four days later, Mr. Schutte replied saying that "It sounds like [Mitchell] may have sent the wrong disk" and indicating that he would follow up with his client.  *Id.*

Yet another week passed with no word from Mr. Schutte.  *Id.* at ¶ 49.  On January 14, 2013, Ms. Rosen emailed Mr. Schutte, asking to "[p]lease advise if you found out from Mitchell the status with the CDs."  *Id.* at Ex. M.

Eight more days of silence ensued.  *Id.* at ¶ 50.  On January 22, 2013, over a month after first alerting Mitchell to the problems encountered with the CD, Ms. Rosen emailed Mr. Schutte again asking for login credentials for the Ultramate CD,

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
NEW YORK

9

EAGLE EYES & E-LITE'S MEMORANDUM OF POINTS AND AUTHORITIES ISO OF THEIR MOTION TO COMPEL
MITCHELL – CASE NO. _____

1    stating that "[t]his is now the fourth time I am asking for this information . . . we

2    have had what appears to be the wrong CD for over a month, we have been unable

3    to move forward with analyzing any of the data and/or determining whether

4    Mitchell has provided us with the information required by the Subpoena." *Id.* at ¶

5    50, Ex. M; *see also* Exs. N, O.

6        Although Mr. Schutte responded to Ms. Rosen's January 22, 2013 email by

7    stating that "[t]he client told me that what you were sent included the data," he has

8    never provided her with a login/password to access any data on the CD.  *See id.*; *see*

9    *also* at ¶ 59.  He also ignored Ms. Rosen's subsequent emails offering to have the

10   parties' IT personnel speak again, providing more information on the problems

11   Manatt was encountering with the CD, and asking if Mitchell could export and send

12   her the pricing data to a usable, non-proprietary format. *See id.* at Exs. N, O, ¶ 52.

13       On January 28, 2013, for the fifth time, Ms. Rosen emailed Mr. Schutte

14   asking him about the status of the Ultramate CD.  *Id.* at ¶ 52(c), Ex. O.  Mr.

15   Schutte, as had become his practice, never responded.  *Id.* at ¶ 52.

16       Eagle Eyes was finally forced on February 6, 2013, to send Mitchell a meet

17   and confer letter indicating its intention to move to compel Mitchell's compliance

18   with the Subpoena.  *See id.* at Ex. P.  In that letter, Eagle Eyes asked, yet again, for

19   the login credentials or for Mitchell to export the pricing data to a usable file

20   format.  *Id.*  During the course of the parties' subsequent telephonic meet and

21   confer on February 20, 2013, Mr. Schutte tacitly acknowledged that:  (1) he had not

22   sent Ms. Rosen the necessary login credentials; and (2) Mitchell can decrypt the

23   data on the Ultramate CD but is generally disinclined to have to do any work to do

24   so.[9] *Id.* at ¶¶ 59-62.

25   [9] In his response to Eagle Eyes' meet and confer letter in connection with this
     Motion, Mr. Schutte offered to send a "replacement CD" to Eagle Eyes.  *See* Rosen
26   Decl. at Ex. Q.  Given the problems Manatt had encountered with the first CD, and
     no acknowledgment of the status of producing the underlying pricing tables
27   separate from the Ultramate CD, Mr. Schutte's utter non-responsiveness as to the
     first CD and clear unwillingness to provide Eagle Eyes with even login
28   information, as well as the upcoming Discovery Cut-Off in the Central District

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
NEW YORK

10

EAGLE EYES & E-LITE'S MEMORANDUM OF POINTS AND AUTHORITIES ISO OF THEIR MOTION TO COMPEL
MITCHELL – CASE NO. _____

In yet another effort at striking a compromise, Ms. Rosen asked Mr. Schutte during their telephonic meet and confer to provide her with an estimate of how much it would cost Mitchell to debug the Ultramate CDs and produce historic pricing information so that Eagle Eyes could better assess any possible burden on Mitchell.  *See id.* at Ex. R, ¶¶ 61-68.  Although Mr. Schutte promised to provide Ms. Rosen with this estimate, he has not done so.  *See id.*

To-date, Mitchell has not responded to Eagle Eyes' questions about the Ultramate CD or otherwise provided it with the necessary credentials to access the pricing data purportedly on the CD, or otherwise responded to Eagle Eyes' request to export the pricing data into a usable, readable format, or even quantify the burden (if any) producing responsive pricing data would impose on Mitchell. Moreover, to-date, Mitchell has only produced:  (1) its industry reports, which as explained, are/were publicly available; and (2) one document relevant to its document deletion policy. *Supra* FN 6, Rosen Decl. at ¶ 59.  Mitchell has not produced any pricing data in a usable format *see infra* FN 1, as required by the Subpoena.

## III. MITCHELL WAIVED ANY AND ALL OBJECTIONS TO THE SUBPOENA

Rule 45 of the Federal Rules of Civil Procedure expressly authorizes the issuance of subpoena commanding a non-party to produce designated records or things.  Fed. R. Civ. P. 45(a)(1)(C).

A party served with a Rule 45 subpoena must either:  (1) refuse to comply and challenge the subpoena if cited for contempt, *United States v. Ryan*, 402 U.S. 530, 532 (1971); (2) move to quash or modify the subpoena or otherwise move for a protective order, *see gen.* Fed. R. Civ. P. 45(c)(3)(A); (3) serve the subpoenaing attorney with "a written objection to inspecting, copying, testing or sampling any or

---

Action, Eagle Eyes declined this request.  *See id.* at Ex. Q, ¶ 60.  Eagle Eyes' offer in November 2012 to assume the burden of analyzing and unlocking responsive pricing data from this CDs has now expired.  *See id.*

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
NEW YORK

all of the materials" within fourteen days after service of the subpoena, Fed. R. Civ. P. 45(c)(2)(B); or (4) produce responsive documents.

The failure to serve timely objections or seek court intervention *waives all grounds for objection to the subpoena*, including any contention that the subpoena is overbroad and/or unduly burdensome.  *In re DG Acquisition Corp.*, 151 F.3d 75, 81 (2d Cir. 1998); *see also Kandant Johnson, Inc. v. D'Amico*, 12-mc-00126, 2012 U.S. Dist. LEXIS 63162 (D. Or. May 4, 2012) ("Had E.S. Constant [served objections], it would have not waived any . . . . Instead, however, [it] simply ignored its obligations under the subpoena and served no written objections at all until . . . after [this] motion to compel was filed."); *Widevoice Communications v. Qwest Communications, Co.*, 12-cv-00467-GMN –VCF, 2012 U.S. Dist. LEXIS 58248, *7-8 (D. Nev. Apr. 26, 2012) (granting motion to compel and finding that absence unusual circumstances, the third party waives untimely objections to a subpoena); *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 636 (C.D. Cal. 2006) (finding that a "nonparty's failure to timely make objections to a Rule 45 subpoena . . . generally requires the court to find that any objections have been waived.").

Mitchell did not serve objections to the Subpoena or seek this Court's involvement.  Rosen Decl. at ¶ 8.  To the contrary, the deadline to serve objections came and went without word from Mitchell; it was only when *Eagle Eyes' counsel reached out to Mitchell* on September 20, 2012, that Eagle Eyes learned that Mitchell would not be producing responsive documents on September 21, 2012, as required by the Subpoena.  *Id.*  Moreover, the first time Mitchell even uttered the word "overly broad" and "unduly burdensome" was in its February 13, 2013 response to Eagle Eyes' meet and confer letter.  *Id.* at Ex. Q.

Based on the authorities above, Mitchell waived any and all objections to the Subpoena.  For this reason alone, the Court should **grant** the Motion and order Mitchell to produce the Pricing Data.

EAGLE EYES & E-LITE'S MEMORANDUM OF POINTS AND AUTHORITIES ISO OF THEIR MOTION TO COMPEL MITCHELL – CASE NO. _____

**IV.   THE COURT SHOULD COMPEL MITCHELL TO PRODUCE RESPONSIVE DATA AND INFORMATION AS MITCHELL HAS NOT COMPLIED IN GOOD FAITH AND THE TIME FOR PRODUCTION HAS LONG SINCE PASSED**

The Federal Rules of Civil Procedure allow for broad discovery of any non-privileged matter relevant to a party's claims or defenses and the "scope of discovery through a subpoena is the same as that applicable to Federal Rule of Civil Procedure and other discovery rules." *LG Display Co. v. Chi Mei Optroelectronics Corp.*, 08cv2408-L (POR), 2009 U.S. Dist. LEXIS 6362, *4 (S.D. Cal. Jan. 28, 2009) (Porter, M.J.); Fed. R. Civ. P. 26(b)(1).

A non-party who receives a subpoena for data, including Electronically Stored Information ("ESI"), has the burden of proving the subpoena seeks irrelevant data, or is overly broad and/or unduly burdensome and/or that the data and ESI is not reasonably accessible.  Fed. R. Civ. P. 45(a)(1)(C); *see also Berwick v. Hartford Fire Ins., Co.*, 12-00055-PHX-FJM, 2012 U.S. Dist. LEXIS 95622, *3-4 (D. Ariz., July 11, 2012) citing *Goodman v. United States*, 369 F.2d 166, 169 (9th Cir. 1966) ("The burden of showing that a subpoena is unreasonable and oppressive is upon the party to whom it is directed."); *Painters Joint Comm. v. Emple. Painters Trust Health & Welfare Fund*, 10-cv-01385-JCM-PAL, 2011 U.S. Dist. LEXIS 113278, 16-17 (D. Nev. Sept. 28, 2011) (opining that party served with a Rule 45 subpoena has the burden of showing with "specific[] detail" why it seeks irrelevant information or imposes an undue burden).

Even then, if the need for the information outweighs the burden and cost of production, the Court has the discretion to order the responding party to produce the requested data.  *See* Fed. R. Civ. P. 45(a)(1)(C).  In making such a decision, courts consider the relevance of the requested data, the requesting party's need for the data, the breadth of the request, the burden or expense on the person subject to the subpoena and whether responsive information is available elsewhere.  *See LG Display Co.*, 2009 U.S. Dist. LEXIS 6362 at *4-9 (granting motion to compel in

part because relevance to issues in pending action outweighed any burden on responding party); *see also Realtime Data, LLC v. MetroPCS Tex., LLC*, 12cv1048-BTM (MDD), 2012 U.S. Dist. LEXIS 73257, *3 (S.D. Cal. May 25, 2012) (Dembin, M.J.) (granting motion to compel in part); *Berwick*, 2012 U.S. Dist. LEXIS 95622 at *4.

### 1.    The Requested Data Is Relevant

The data requested from Mitchell—pricing data including the underlying sales price of autolights in the United States during the relevant time period—is relevant to the claims and defenses in the Central Action.  The Mitchell data not only contains the prices at which Eagle Eyes and its co-Defendants' sold aftermarket autolights in the United States, but the prices at which its competitors sold aftermarket autolights in the United States.  This data is relevant to assessing the plaintiffs' allegations that Defendants fixed the prices of aftermarket autolights and that they paid an overcharge as a result of the alleged conspiracy.  Market data—including what other manufacturers were charging for products during the relevant time period—is needed to determine whether plaintiffs were charged more than they otherwise would have been in the absence of an alleged conspiracy.  *See id.* (finding requested documents were relevant).

And while Eagle Eyes is sensitive to the fact that Mitchell is a non-party, the fact that Mitchell is the *only* source of this data militates in favor of production.  *See id.* (noting that requested documents "are not available from other sources.").  Mitchell is the only organization of its kind in the United States that collects pricing data for the automotive industry.  *See* Rosen Decl. at ¶ 5.  It is not feasible to have Eagle Eyes serve subpoenas on all the manufacturers of autolights sold in the United States for their pricing data as there are literally dozens of such manufacturers, some of whom are beyond subpoena power because they sell to end users in the United States "FOB" from overseas.

Because the relevance of this Pricing Data to the issues in the Central District

14

Action coupled with the fact that the requested Pricing Data is available from any other source outweighs any undue burden Mitchell could claim the Subpoena imposes, this Court should grant the Motion.

### 2.     The Burden On Mitchell Is Minimal And Its Delay Tactics Must Come To An End

"There is no doubt that document production . . . [is] burdensome.  Access to relevant documents is, however, necessary for the search for truth.  The question under Federal Rule of Civil Procedure 45 . . . is whether the proposed production exposes [the responding party] to significant expense or undue burden." *Wilbur v. City of Mount Vernon*, C11-1100RSL, 2012 U.S. Dist. LEXIS 91473, *9-10 (W.D. Wash. June 27, 2012) (finding the burden on the responding party was not excessive).  Moreover, the responding party must do more than just generally state a request is unduly burdensome – it must *prove* it.  *See Painters Joint Comm*, 2011 U.S. Dist. LEXIS 113278 at *17 (denying motion to quash third party subpoena because party failed to prove the subpoena was unduly burdensome).

Here, Mitchell cannot meet its burden of proving that the Subpoena imposes an undue burden. *See id.*  First, it is undisputed that Mitchell has the Pricing Data and that it has never once quantified the burden and costs it would incur to produce responsive data.  *See Marti v. Baires*, 08-cv-00653-AWI-SKO PC, 2012 U.S. Dist. LEXIS 77962, *49-50 (E.D. Cal. June 5, 2012) (finding that non-party must produce the data it has unless it proves that it is not accessible).  At most, Mitchell has said that production would be expensive and time consuming; it said producing historical pricing data would be expensive but never stated how much it would cost; it said it would be expensive to write queries for the Estimate's database, but never said how much it would cost or how many man hours it would take; it said "debugging" Ultramate would be labor intensive but did not explain why or how. Mitchell has never provided Eagle Eyes with a cost-estimate or provided Eagle Eyes with data justifying its claims that production would be expensive and time-

EAGLE EYES & E-LITE'S MEMORANDUM OF POINTS AND AUTHORITIES ISO OF THEIR MOTION TO COMPEL MITCHELL – CASE NO. _____

1  consuming.  *See* Rosen Decl. at ¶¶ 61-68, Exs. Q-R.

2        Second, by Mitchell's own concession it should be able to readily access

3  Pricing Data.  The fact that Mitchell can "debug" Ultramate means that the pricing

4  data exists "live," and is not solely on a back-up tape.  Rosenthal Decl. at ¶ 16.

5        Third, the process of extracting and piecing together Mitchell's own pricing

6  tables from its own software should not be unduly burdensome or cost prohibitive

7  according to industry practices and standards.  *See id.* at ¶ 15.  As a master copy of

8  pricing data is typically stored in a database format such as Microsoft SQL,

9  Microsoft Access, Raima Database Manager, or some similar database application,

10  and as all such database applications allow for the export of data, it would be

11  relatively simple for a database administrator to run a report which would be able to

12  list the part name, part number, description, date period, and pricing information.

13  *See id.*  Alternatively, if the pricing data is stored in a database, it would be possible

14  to export the entire database to a standard delimited text file.  *See id.*  Or, if the

15  relevant data fields are stored across multiple tables, i.e. in relational databases,

16  Mitchell could run reports across these different related database and export the

17  result product to a standard delimited text file for Eagle Eyes to view.  *See id.*

18        Fourth, although Eagle Eyes requests data spanning 9 years, this factor is

19  outweighed by the importance of the Pricing Data to the issues in dispute in the

20  Central District. *See LG Display Co.*, 2009 U.S. Dist. LEXIS 6362 at *4-9 (granting

21  motion to compel that requested data spanning eight years).

22        Finally, equity demands that Mitchell's own delay tactics and demonstrated

23  bad faith should prevent it arguing undue burden.  Mitchell has done nothing but

24  seek to avoid or otherwise pass its production burden off to Eagle Eyes.  All

25  Mitchell has done is to send Eagle Eyes a CD; but the sending of a CD—that

26  cannot even be accessed—does not comport with the spirit of the Federal Rules of

27  Civil Procedure or Mitchell's production obligations.  *See gen.* Fed. R. Civ. P. 37

28  (requiring cooperation in discovery).  Even though Mitchell is the party best

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
NEW YORK

16

EAGLE EYES & E-LITE'S MEMORANDUM OF POINTS AND AUTHORITIES ISO OF THEIR MOTION TO COMPEL
MITCHELL – CASE NO. _____

1  equipped to decrypt its own proprietary software, Eagle Eyes agreed to accept a

2  sample CD and pricing tables and to try to devise a work-around to minimize any

3  burden on Mitchell.  Eagle Eyes now understands that their good intentions have

4  back-fired and that Mitchell does not "want" to have to do any "work" to comply

5  with this Subpoena.  *See* Rosen Decl. at ¶¶ 57-59.  Mitchell's delay and posturing

6  for the past five months has imposed an undue burden on Eagle Eyes.

7        The time for production long ago elapsed and it is clear that Mitchell will not

8  honor its obligations pursuant to Rule 45 without a Court order.  As such, the Court

9  should **grant** the Motion and Order Mitchell to produce the Pricing Data.

10  ## V.   CONCLUSION

11        Based on the foregoing, this Court should **GRANT** Eagle Eyes' Motion to

12  Compel and Order Mitchell to, within fourteen (14) days of the date of this Order,

13  either:  (1) export and produce in usable data all pricing data for autolights between

14  January 1, 2001 and December 31, 2010, **OR** (2) create and run all necessary

15  queries to retrieve responsive data from the Estimate's Database and produce that to

16  Eagle Eyes for the period of January 1, 2001 and December 31, 2010, whichever

17  the Court deems appropriate.

18

19  Dated:  February 25, 2013

By:   /s/ Diana Iketani Iorlano

20  Diana Iketani Iorlano
MANATT PHELPS & PHILLIPS LLP
11355 West Olympic Blvd.

21  Los Angeles, CA 90064
Telephone:    +1-310-312-4000

22  Facsimile:    +1-310-312-4224

23  Attorneys for Defendants
EAGLE EYES TRAFFIC INDUSTRIAL

24  CO., LTD. and E-LITE AUTOMOTIVE

25

26

27  306464651.3

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
NEW YORK

EAGLE EYES & E-LITE'S MEMORANDUM OF POINTS AND AUTHORITIES ISO OF THEIR MOTION TO COMPEL
MITCHELL – CASE NO. _____